IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 11 CR 356 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| ALEX A. MELENDEZ. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Alex Melendez's motion to suppress evidence and quash the arrest [60]. For the reasons below, Defendant's motion [60] is denied.

**I.    Background**

The Seventh Circuit has described "the resolution of a motion to suppress" as a "fact-intensive inquiry" in which the district court must make "credibility determinations" based on "its opportunity at the suppression hearing to hear the testimony and observe the demeanor of the witnesses." *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005); see also *United States v. Springs*, 17 F.3d 192, 194 (7th Cir. 1994) (explaining the deference given to the credibility determinations of the district judge who has "heard the conflicting testimony, observed the witnesses, and then reached a determination about whom to believe").  In this case, the Court convened a suppression hearing on June 12, 2012, at which time counsel for Defendant Melendez and counsel for the Government presented the testimony of three witnesses: Defendant Melendez, Special Agent Brett O'Connor of the Drug Enforcement Administration ("DEA"), and Lake County Sheriff's Deputy John Van Dien.  After considering the testimony of the witnesses and assessing their credibility, the Court sets forth the following recitation of the facts surrounding the encounter between Melendez and the law enforcement officers that gave

rise to the federal charges against Melendez and the motion to suppress currently before the Court.

During the afternoon of March 16, 2011, as part of an ongoing investigation, DEA agents and local police officers were conducting surveillance on the home of Melendez's co-defendant, Jesus Gonzalez, in the 600 block of Fulton Street in Waukegan, Illinois. At approximately 3:15 p.m., a white Mercury sedan parked in the driveway of Gonzalez's residence. Gonzalez met briefly with the occupants of the Mercury sedan, and then the vehicle departed. At approximately 3:23 p.m., Lake County sheriff's department deputies stopped the Mercury sedan and found small amounts of marijuana inside the vehicle. The occupants of the vehicle were placed under arrest and charged in state court with possession of controlled substances.

Between 3:23 p.m. and 4:10 p.m., officers conducting surveillance observed approximately six additional vehicles park in Gonzalez's driveway for brief periods of time and then depart. One of the vehicles was a red Dodge Stratus driven by Melendez. The agents watched Gonzalez walk from his home and briefly enter the front passenger seat of the Dodge Stratus. Gonzalez then left the vehicle and Melendez drove away.

Lake County sheriff's deputies and DEA agents began to follow the Dodge Stratus. Special Agent Brett O'Connor, who was conducting the surveillance of the house, instructed sheriff deputies John Van Dien and Felix Pena, to observe and stop the vehicle when they had obtained independent probable cause to conduct a traffic stop. At approximately 4:15 p.m., Melendez turned on to State Route 120 (also known as Belvedere Road), less than a mile from the house on Fulton Street. Melendez later told O'Connor that he was talking on the phone with his brother as he was driving down Route 120. As Melendez continued down Route 120, O'Connor and the deputies observed Melendez's vehicle change lanes—from the outside lane to

2

the inside lane—without using a signal. Upon making that observation, O'Connor directed the deputies to perform a traffic stop of Melendez and his vehicle.

When Melendez noticed the police vehicle behind him, he pulled over to the shoulder. Van Dien and Pena then approached the vehicle and asked Melendez for his license and proof of insurance. Melendez asked why he had been pulled over, and Van Dien advised him that he did not use his turn single while changing lanes. Defendant then responded, "Come on Van Dien. You know you don't pull people over for turn signals. What did you stop me for?" Van Dien then asked Melendez who owned the vehicle. Melendez stated that it belonged to a girlfriend.

Van Dien observed a large amount of cash inside the center console and asked Melendez if he had anything illegal in his vehicle. Melendez said he did not. Van Dien asked if Melendez would consent to a search of the vehicle; Melendez declined. Van Dien then advised Melendez that he was going to call a canine unit and run Melendez's information through the computer. As Van Dien turned to walk back to the police vehicle, Pena yelled out that he saw something suspicious in the vehicle. On closer inspection, however, it turned out that the item that Pena saw was a gum wrapper.[1]

Before Van Dien reached his patrol car, Pena yelled to Van Dien that Melendez wanted to talk to him. Van Dien returned to the Dodge Stratus, and Melendez said, "I know you just didn't pull me over for the traffic. I know what you're all about. So do all the other people in the area." Melendez then said that he needed to talk to Van Dien but he did not want to talk on

---

[1] Melendez testified that upon seeing the item, Pena drew his weapon and pointed it at Melendez. According to their testimony, neither Van Dien nor O'Connor saw Pena draw his weapon. O'Connor explained that if he had seen a weapon drawn, he would have reacted both by altering other agents in the area and by proceeding on foot closer to the location of the traffic stop. Taking into account the totality of the circumstances surrounding the stop, the Court finds it unlikely that Pena would have drawn a weapon during daylight hours on a state highway in response to a sighting of suspected contraband. Furthermore, if Pena had drawn his gun, the Court finds it unlikely that neither Van Dien nor O'Connor would have seen or learned of it and either come quickly to the scene or called for additional support.

the street because "gang bangers" were watching them. Van Dien asked Melendez where he would like to go, and he said that he wanted to go down the street. Van Dien informed Melendez that there was an elementary school, Andrew Cooke Magnet School, approximately half a bock away and that the deputies would follow Melendez to the school. Melendez agreed to meet at that location. He then drove to the school with the officers following him.

When both cars reached the school, Van Dien got out of his car and approached Melendez, who was still in the driver's seat. Van Dien asked Melendez what he wanted to discuss and he stated, "Well, you got me." He said he knew that he was not pulled over for a traffic offense and added, "I got a brick of cocaine on me. You got me." Van Dien asked Melendez what he meant, and Melendez began to reach under his seat. Van Dien expressed concern, to which Melendez responded, "Van Dien, I would not shoot you." Melendez began to pull a white plastic grocery bag from under the seat, but stopped and said he could not continue. Van Dien asked why, and Melendez said he was afraid that other people were watching and listening.

Van Dien then informed O'Connor—who had been watching from around the corner—what was in the car. The deputies and O'Connor assisted Melendez out of the car, handcuffed him, patted him down, and placed him in the back of the patrol vehicle. Melendez continued to express concern for his safety, so the officers told him to put a hoodie over his face and lie down in the back seat. The deputies then transported Melendez to the Lake County Sheriff's Office. Van Dien advised Melendez not to say anything until he was advised of his rights. When the deputies and Melendez arrived at the office, they escorted Melendez through the back entrance because he was concerned about being seen by prisoners who were housed near the front entrance.

Special Agent O'Connor, Special Agent Keith Bakewell, and Task Force Officer Jay Tapia arrived at the sheriff's office, and at approximately 5:30 p.m., Melendez was advised of his rights and signed a waiver of those rights. In a subsequent written statement, Melendez admitted that he changed lanes without using a turn signal, claiming that he was trying to get away from a "guy flying." Melendez also admitted that he paid $30,000 for the brick of cocaine and that he had picked up cocaine from the house on Fulton Street approximately twice. At 9:25 p.m., Melendez made an additional handwritten statement that admitted that "I pulled up in Cooche's [Gonzalez's] driveway. He was standing in driveway waiting for me. I pulled up, he jumped in my car. I gave him a bag of $30,000 and he handed me a brick. . . Law dogg [Van Dien] pulled me over so we talk for a bit then I asked to move down street. He asked me if I had anything and I told him the truth. What I had. And it was a brick, and he took me to station." Melendez does not dispute that the statements produced by the government are in his handwriting and contain his signature.

## II. Analysis

Plaintiff argues that because the officers did not have probable cause to perform a traffic stop, all statements that he subsequently made should be suppressed and his arrest should be quashed. The Government argues, on the other hand, that the officers had probable cause to effectuate a traffic stop and thus his statements are admissible. In the alternative, the Government submits that there was reasonable suspicion to stop Melendez's vehicle under the collective knowledge doctrine. Because the Court finds the Government's primary contention dispositive, the Court need not address the alternative argument.

The decision to stop a vehicle for a traffic violation must be objectively reasonable. See *Wren v. United States*, 517 U.S. 806, 810 (1996). A police officer's actions are reasonable if he

has probable cause to believe that a traffic violation has occurred. See *id*; *United States v. McDonald*, 453 F.3d 958, 961-62 (7th Cir. 2006) ("An officer has probable cause for a traffic stop when she has an 'objectively reasonable' basis to believe a traffic law has been violated."); *cf*. *United States v. Bohman*, 683 F.3d 861, 862-63 (7th Cir. 2012) (holding that police officer could not lawfully stop a vehicle simply because it emerged from a site suspected of drug activity where officer "conceded that he did not observe any traffic violations before the stop"). Although probable cause requires more than a bare suspicion of criminal activity, it does not require evidence sufficient to support a conviction. See *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). "The Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent [of the officer]." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (emphasis in original). In other words, the actual motivations of the officer do not dictate the constitutional reasonableness of the traffic—a pretextual stop may be lawful if it is "reasonable." *Whren*, 517 U.S. at 810.

In this case, both Special Agent O'Connor and Deputy Van Dien testified that they saw Melendez change from the outside to the inside lane on Route 120 without using his turn signal. Under Illinois law, a motorist must signal before changing lanes. 625 ILCS 5/11-804. The Seventh Circuit has been clear that if an officer observes a driver fail to signal a change in lane, the officer has probable cause to stop the car. See *United States v. Moore,* 375 F.3d 580, 583 (7th Cir. 2004). While at the hearing Melendez insisted that he did use a signal, the Court concludes on the basis of the testimony as a whole and the totality of the circumstances that he did not. First, O'Connor and Van Dien credibly testified that they observed Melendez change lanes without using his signal. Second, O'Connor testified that the location of the traffic stop was not ideal because the officers would have preferred to pull Melendez over further away from

6

the surveillance site. Pulling him over close to the site of the surveillance could have drawn attention to the presence of police in the area, thereby hampering the ongoing investigation.[2] But once Melendez failed to use his signal to change lanes, the officers had "such a blatant use for probable cause to conduct a traffic stop" that they decided to effectuate the stop. Third, O'Connor credibly testified to Melendez's post-arrest admission that he was talking on a cell phone with his brother while driving, which as a matter of common sense and every day experience increases the likelihood that Melendez changed lanes without using his signal. All of these circumstances lead the Court to conclude that the officers had probable cause to perform a traffic stop based on their observations that Melendez failed to use his signal when changing lanes.

Once the officers pulled Melendez over for the traffic violation, Van Dien was permitted to ask Melendez whether there was anything illegal in the vehicle. See *United States v. Childs*, 277 F.3d 947, 953-54 (7th Cir. 2002) (en banc) ("What happened here must occur thousands of times daily across the nation: Officers ask person stopped for traffic offenses whether they are committing any other crimes."). Van Dien also was entitled to call for a canine unit to sniff the vehicle. See *Illinois v. Cabelles*, 543 U.S. 405 (2005); *United States v. Brock*, 417 F.3d 692, 695 (7th Cir. 2005) ("The Court held in *Cabelles* that a dog sniff of a vehicle during a traffic stop, conducted absent reasonable suspicion of illegal drug activity, did not violate the Fourth Amendment because it did not implicate any legitimate privacy interest.") The credible and lawful threat to bring a canine to the scene likely impressed upon Melendez the need to make a quick decision whether to volunteer that he was carrying illegal narcotics or await the inevitable

---

[2] O'Connor specifically testified that pulling over Melendez so close to the house was "not ideal by any means. We try to avoid it greatly because of its close proximity to a house where I have agents set up on that we're surveilling, it could, we use the term heat up the area. Any type of additional police activity so close to a house would not be beneficial to our investigation, so it was not ideal by any means."

7

discovery once the dog arrived, for it was highly unlikely that a dog trained to detect even small quantities of drugs would not have alerted in the presence of an entire kilogram of cocaine in a vehicle. Given his predicament, it is not surprising that Melendez agreed with Van Dien's suggestion to get off the main road (Route 120) and move to a quieter area to continue their discussion. Nor is it surprising that after moving to the school parking lot, Melendez admitted that he had a brick of cocaine and spent the rest of the evening hoping to curry enough favor with the officers that he would neither be detained that evening nor charged then or on any later date.

After Melendez was arrested, he signed a written waiver of his Miranda rights and gave written and verbal post-arrest statements. Melendez argues that his statements should be suppressed because they are fruits of the poisonous tree—having been obtained after the officers pulled him over for pretextual reasons and without probable case. But because the Court concludes that the officers did have probable cause to stop Melendez's vehicle for a traffic violation on the basis of credible testimony that Melendez failed to use his turn signal before changing lanes, the stop was proper. And because Melendez has not presented to date any persuasive evidence that his subsequent statements to police were obtained through improper means, his motion to quash and suppress must be denied.

## III. Conclusion

For the reasons stated above, Defendant's motion to quash and suppress [60] is denied.

Dated:  August 20, 2012

_____
Robert M. Dow, Jr.
United States District Judge